The LADY HORATIA (PRITCHARD v.). See Case No. 11,438.

The LADY MAUNSEL (SUTHERLAND v.). See Case No. 13,642.

## Case No. 7,985.

### The LADY PIKE.

[2 Biss. 141; [1] 8 Am. Law Reg. (N. S.) 614.]

District Court, D. Wisconsin. April Term, 1869.[2]

#### LIABILITY OF TOW IN PASSING BRIDGE.

1. When a steamboat with three loaded barges in tow, having approached a bridge in fair weather too closely to back or stop, is driven against a pier by a sudden and unexpected gust of wind, the carrier is not liable for loss or injury to the cargo of one of the barges.

[Distinguished in the Mollie Mohler. Case No. 9,701; The Columbia, 48 Fed. 326.]

2. The tow being in good order and well manned, the passage of the bridge by similar tows being usual and safe, and no negligence being proved against the carrier, he can avail himself of this defense as within the exception in the bill of lading.

[See note at end of case.]

This steamboat was contracted with to proceed up the Mississippi and Minnesota rivers to Shakopee, in the state of Minnesota, with three barges; and there to take on board the barges' wheat in bulk, and to transport the same to Saranac, on the first named river, in the state of Illinois. The wheat was put aboard the barges to be delivered in good order, "unavoidable dangers of the river" and fire only excepted. Heading down the Mississippi river, the steamboat with the three loaded barges, two on her larboard and one on her starboard side, and running between piers of the railroad bridge near St. Paul, the larboard barge collided with a pier, and the wheat on board said barge was greatly damaged. The insurance companies having paid the loss, brought this libel. The accident happened about three or four o'clock in the afternoon of April 24th.

Claimants allege in the answer that the steamboat and barges left Shakopee in good order, and proceeded on the trip with all possible care, caution and skill; that when passing through the piers in the usual way, and while in the usual channel for such passage, the steamboat and barges were by a sudden gust of wind blown to the larboard, so that the larboard barge struck the pier on that side and was sunk. It is further alleged that the steamboat and barges were fully and completely manned and equipped, and in all respects river-worthy, and were carefully and skillfully managed at the time of the injury, and that the sinking and consequent loss was an unavoidable

danger of the river. The charge in the libel of negligence and improper conduct is denied in the answer.

E. Mariner, for libellant.

Wm. P. Lynde, for respondent, cited Amies v. Stevens. 1 Strange, 128; Hays v. Kennedy, 41 Pa. St. 378.

MILLER, District Judge. There is no doubt from the evidence that the boat and barges were in good order for the service, fully equipped and manned, and in every respect river-worthy. There happened to be on board two captains and also two pilots at the wheel, at the time of the accident, and every man on board was then at his post of duty.

The river was high, with a current at the piers of about three miles to the hour, and nearly in line with the piers. By measurement on the ice the space between the piers was 116 feet, which probably would be increased some at a high stage of water by an inward inclination of the walls of the piers. The tow measured in breadth about 105 feet. The tow was running for the center between the piers, and in a calm would clear them by about five and a half or six feet. Occasional gusts of wind met the tow through the day, but for an hour before reaching the piers there was a calm, and those on board had no anticipation of wind on approaching the piers. But when within the length of the boat from the piers a sudden gust of wind struck the tow and forced it against the pier and stove the barge. The boat was light, and having but a stern wheel she could not back with the three loaded barges in time to avoid the collision, but was obliged to keep on her course. The rate of speed was then about seven miles an hour. The channel seems to be divided, a portion passing between the piers, which was pursued by the tow, and a portion between the adjoining piers, which is wider, but it is said was not then taken by tows on account of a sunken barge. Other loaded tows passed down in the course taken by this tow in safety; and this tow passed up safely three days before the accident, with the knowledge of the shipper. It is not settled that the current could have caused the collision with the pier. [Some witnesses testify that it is unsafe to pass a tow of that breadth between those piers. And it is also testified that the piers should have been approached at a slow bell. On the other hand, it is testified, by experienced river steamboat men, that the boat would be more manageable at the rate of seven miles an hour than slower. I think this latter opinion is the more satisfactory. And experience has tested the safety of passing between those piers with tows about the breadth of this one.] [3] I am well satisfied. that if the piers had been approached by the tow under a

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

[2] [Affirmed by circuit court; case unreported. Decree of circuit court reversed by supreme court in 21 Wall. (88 U. S.) 1.]

[3] [From 8 Am. Law Reg. (N. S.) 614.]

high wind the boat should be condemned for unskillfulness of the officers. But there was a calm until the approach to the pier was too close to admit of avoiding the effect of an unanticipated and sudden gust of wind. It is contended that the alleged cause of the collision was an afterthought, as it is not mentioned in the protest. The omission may possibly tend to weaken the force of the testimony on this subject; but it is not probable that such a number of witnesses, including nearly every man on board, would testify to a fabrication. I consider the alleged cause of the collision established by the proof. Libellants insured against the consequences of the collision; but did the contract of the carrier guarantee indemnity to the shipper?

The supreme court of the United States in The Niagara v. Cordes, 21 How. [62 U. S.] 8, lay down the position that a common carrier is responsible for every loss or damage however occasioned, unless it happened by the act of God, or the public enemy, or by some other cause or accident, without any fault or negligence on the part of the carrier, and expressly excepted in the bill of lading. In Clark v. Barnwell, 12 How. [53 U. S.] 272, although the injury to a portion of the cargo may have been occasioned by one of the excepted causes, yet still the owner of the vessel is responsible if the injury might have been avoided by the exercise of reasonable skill and diligence in the storage or care of the goods on the part of the persons employed in the conveyance of the goods. The onus probandi then becomes shifted upon the shipper to show the negligence. This case involved exclusively the duty of a master in the stowage and care of the cargo. In Stainback v. Rae, 14 How. [55 U. S.] 532, the collision being considered the result of inevitable accident, neither party was held liable; also, The Morning Light, 2 Wall. [69 U. S.] 550. Inevitable accident must be understood to mean a collision when both parties have endeavored by every means in their power, with due care and caution, and a proper display of nautical skill, to prevent the occurrence of the accident. Union Steamship Co. v. New York & Virginia Steamship Co., 24 How. [65 U. S.] 307. In New Jersey, etc., Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344, 347, 383, it appears to be the understanding that under the exception in this bill of lading it is incumbent on the carrier, in order to relieve himself from responsibility, to prove that due diligence and proper skill were used to avoid the accident, and that it was unavoidable. The carrier must satisfy the court by clear and conclusive testimony that there was no default on his part, and that every reasonable effort was made to avoid the accident. But he is not expected to warrant that his crew is perfect, or that his boat or vessel is perfectly secure, or that he pursued the best course on his voyage. It is sufficient if the crew and vessel are in all respects adequate to the particular duty and service, and that the course taken was used ordinarily and proved to be safe.

I am satisfied that the defense is available to claimants, within the exception in the bill of lading. A carrier is not responsible for the effects of sudden gusts of wind. This is a danger and accident of navigation over which he has no control, and against which his contract contains no warranty. Boisterous weather, adverse winds, and low tides are beyond the control of carriers on the ocean, and relieve them from responsibility for delay in the voyage, or injury to the cargo. Upon the same principle a carrier should not be answerable for goods lost by tempest or a sudden gust of wind. An act of God relieves the carrier when using due caution and skill.

In the case of Amies v. Stevens, 1 Strange, 128, the plaintiff put goods on board the defendant's hoy, who was a common carrier. Coming through a bridge by a sudden gust of wind the hoy sunk, and the goods were spoiled. The plaintiff insisted that the defendant should be liable, it being his carelessness in going through at such a time. The defendant was held not answerable, the damage being occasioned by the act of God, an extraordinary accident. In Colt v. McMechen, 6 Johns. 160, where a vessel was heading up the Hudson river against a light and variable wind, and being near shore, and while changing her course the wind suddenly failed, in consequence of which she ran aground and sunk, it was held that the sudden failure of the wind was the act of God and excused the master, there being no negligence on his part. Kent, C. J., concurred in the opinion that the sudden failure of the wind was the act of God, and an event which could not happen by the intervention of man, nor be prevented by human prudence. But he thought there was a degree of negligence imputable to the master in sailing so near the shore under a "light and variable wind," that a failure in coming about would cast him aground. "God caused the gust to blow in the one case, and in the other the wind was stayed by Him." It is well settled that when collision or loss occurs in the absence of fault on the part of the carrier, and under circumstances beyond his control from vis major, as from storm, or waves, or reflux of the tide, or lightning, he is not held liable. Abb. Shipp. (Perkins' Ed.) 470, and cases cited.

The bill will be dismissed.

See Elliott v. Rossell, 10 Johns. 1, as to effect of a sudden gust of wind in a dangerous channel, the carrier knowing the dangers of the rapid. Opinion by Kent, C. J.

[NOTE. Upon an appeal by the libellant to the circuit court this decree was affirmed. Case unreported. Thereupon the libellant took the case upon an appeal to the supreme court, which reversed the decree, the opinion being delivered by Mr. Justice Clifford. It was held that the

proofs furnished upon the hearings below were sufficiently positive to show to the court that neither the master nor any of the steamer's company had sufficient knowledge of the position of the piers, of which there were five, one being unfinished and submerged at high water.

[The pass in which the accident occurred was only 116 feet in width, but the other over the submerged pier was 264 feet. The width of the tow was 105 feet, and, in the opinion of the learned justice, it was negligence and inexcusable ignorance of the dangers and facilities of the navigation of the place which caused the loss, in not taking advantage of the wider passage. Some allowance should also have been made for leeway, as the current at high water tended to force the craft towards the pier on the port side. It was further remarked that "knowledge of the kind, in river navigation, is peculiarly essential, as the current frequently shifts from one side towards the other, and the track of navigation is often obstructed by snags, sand bars, and shoals, which no degree of skill would enable the mariner or pilot to avoid without a prior knowledge of their existence." In the opinion of the court there was enough evidence to show that it was the current that forced the craft to leeward, and not the gust ·of wind. The Lady Pike, 21 Wall. (88 U. S.) 1.]